

*overruled by S-165*

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable C. R. McNamee, Director
Rate Division
Railroad Commission of Texas
Austin, Texas

Dear Sir:

Opinion No. 0-5256
Re: Lawfulness of filing of tariff with the War Department providing for intrastate carriage of Government property at rates other than those prescribed by the Railroad Commission.

Your letter of inquiry of April 26, 1943 reads in part as follows:

"On April 6, 1943 there was issued by one J. D. Hughett, Agent, Southwestern Motor Freight Bureau, Inc., Dallas, Texas, Supplement A to Southwestern Motor Freight Bureau, Inc., Tariff No. 1-C, the said supplement A showing on its title page that it became effective April 15, 1943. A copy of this supplement A is enclosed herewith and your attention is directed to the following provisions of the said supplement A:

"'This Supplement Filed with the War Department for account of carriers referred to below to establish volume rates on Government Traffic.'

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

Honorable C. R. McNamee, Page 2

"....

"'The volume rates named in Tariff, as amended (including rules and other provisions applicable in connection therewith in this or in governing tariffs), applicable between points in Texas on Interstate Traffic, will also apply between points in Texas on Intrastate Traffic consisting of property of the United States moving on Government bills of lading or on commercial bills of lading to be converted to government bills of lading.'

"Until Supplement A was issued Southwestern Motor Freight Tariff No. 1-C and the rates therein published had no application whatever on Texas intrastate traffic, but the tariff contained rates for application between points in Texas on the one hand and points in other states on the other hand, as well as rates for application on <u>interstate</u> traffic between points in Texas.

"No application was filed with the Railroad Commission of Texas for authority to publish and make effective Supplement A or the provisions thereof for application of the interstate volume rates therein on Texas intrastate shipments consisting of United States government freight.

"While the former rulings from the Attorney General's Department hold that the Federal government may contract for its transportation service, the publication in Supplement A, referred to, does not appear to reflect a <u>contract</u> between the United States Government on the one hand and any one or more common carrier motor carriers on the other hand; but it appears to be an open publication by the motor carriers under which they provide varying bases of rates to apply intrastate in Texas on shipments consisting of property of the United States government when moving under government bills of lading."

Honorable C. R. McNamee, Page 3

You quoted from a letter received by you from J. D. Hughett by whom Supplement A to Tariff 1-C was issued. One paragraph of which reads as follows:

"'Referring to the last paragraph of your letter wish to advise that we have been for some time pressed by the War Department for the publication of volume rates on traffic moving between points in Texas and the matter was held in abeyance pending action in connection with our volume rate application before the Railroad Commission of Texas. However, it appeared that it would be some time before rates under such application would be available, therefore, the suggestion was made that we file a lettered supplement to our Tariff 1-C with the War Department for the account of such carriers as desired to enter into protecting of the interstate rates for the movement of Government Traffic moving between points in Texas. This was done to alleviate the necessity for the Government and the carriers entering into so many individual contracts governing the movement at this time when there is so much of it moving and when time is so important. Therefore, our carriers were circularized and we received the authority to file such rates for the account of all lines, except the Missouri Pacific Transport Company.'"

The foregoing statement of the reason for the issuance of this supplement coupled with the fact that the copy of the supplement enclosed with your request reads in part as follows:

"This supplement filed with the War Department for account of carriers referred to below to establish volume rates on Government traffic."

leads us to confine our answer to the validity of such rates when applied to shipments by the War Department. If in the future you should ever be confronted with the question of the legality of such rates when applied to shipments other than military by the Government we shall rule upon such question

Honorable C. R. McNamee, Page 4

when it arises.

You have orally supplied me with the following explanation of the term used in the supplement reading as follows:

"consisting of property of the United States moving on Government bills of lading or on commercial bills of lading to be converted to Government bills of lading."

War Department property is intended to move on Government bills of lading but often the Government red tape prevents the issuance of such bills of lading promptly and its property is moved on a commercial bill which is converted into a Government bill as expeditiously as Government channels will permit.

You end your letter with the following inquiries:

"The inquiry above herein perhaps may present two questions, viz:

"1. Whether, except under individual contract, the common carrier motor carriers may lawfully publish and apply rates intrastate in Texas on United States government freight which rates are different from rates prescribed by the Railroad Commission for general application, and for which no authority has been obtained from the Commission;

"2. Whether the publication in Supplement A to Southwestern Motor Freight Bureau, Inc. Tariff No. 1-C is in fact a contract between the common carrier motor carriers on the one hand and the United States government on the other hand, as coming within the prior rulings of the Attorney General's Department."

Honorable C. R. McNamee, Page 5


We have previously ruled in Opinion No. O-2954
referred to in your letter as follows:

"So far as your question is concerned we
think it is immaterial whether the contract is
made after advertisement for bids or otherwise.
The Congress has enjoined upon the officers of
the Federal Government the duty to make such
contracts, by statutes plainly evidencing an
intent for such officers to obtain the most
economical transportation as possible. The
charges to be made for the service is a major
factor in such contracts for carrier service.
To allow the State to fix the rates and charges
for the transportation service involved in these
contracts would be to permit it to make the con-
tract in large part. Such would constitute a
direct interference with the Federal Government
in its discharge of constitutional functions.
The principles announced in such cases as Louwein
vs. Moody, 12 S. W. (2d) 989; Johnson vs. Mary-
land, 254 U. S. 51, 41 S. Ct. 16; Metcalf vs.
Mitchell, 269 U. S. 514, 70 L. Ed. 384; Panhandle
Oil Co. vs. Miss., 277 U. S. 218, 72 L. Ed. 657,
are applicable.

"In our opinion, carriers may contract with
the Federal Government for the transportation of
intrastate freight for the military without re-
gard to the rates and fares approved by the Rail-
road Commission. And this is true whether the
contract is made pursuant to advertisement for
bids or not."

It being lawful for the carrier to transport at
whatever rates are mutually acceptable to it and the Government
it can not be a violation of the law for the carrier to post
with the War Department an offer to transport for the rates
contained in such offer. The publication of the tariff is not
a multiple contract or even a contract at all. It is no more
than an offer, a holding out, a declaration of willingness by

Honorable C. R. McNamee, Page 6

the offerer that he will transport goods for the War Department at the rates therein specified. Each time the War Department tenders goods to be carried under the tariff in question and the carrier accepts the goods for transportation there is a contract, the terms of which are not in the sphere of the State's authority to regulate.

You are accordingly advised that:

1. Common carrier: motor carriers may lawfully publish and apply rates intrastate in Texas on War Department freight which rates are different from rates prescribed by the Railroad Commission for general application and for which no authority has been obtained from the Commission; and that

2. The publication of such tariff is not a contract between the carrier and the Government.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By David W. Heath

David W. Heath
Assistant

DWH:fe

APPROVED MAY 10, 1942

Gerald C. Mann

ATTORNEY GENERAL OF TEXAS